

Case 11-22755    Filed 02/06/12    Doc 327

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

FILED
FEB 06 2012
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re:                                    )   Case No. 11-22755-D-11
                                          )
CURTIS A. WESTWOOD,                       )   Docket Control No. MLG-7
                                          )
                    Debtor.               )   Date:  January 11, 2012
                                          )   Time:  10:00 a.m.
                                          )   Dept:  D
_____)

This memorandum decision is not approved for publication and may
not be cited except when relevant under the doctrine of law of
the case or the rules of claim preclusion or issue preclusion.

### MEMORANDUM DECISION

On August 31, 2011, Meyers Law Group, P.C. ("MLG") filed a
fist and final application for compensation and reimbursement of
expenses for services rendered to the former debtor-in-
possession, Curtis A. Westwood, in this case (the "Application").
Comerica Bank ("Comerica"), the largest creditor in this case;
Travelers Casualty and Surety Company of America ("Travelers");[1]
and Jon Tesar, the trustee appointed in this case (the
"Trustee"), oppose the Application (collectively, the "Objecting
Parties").

_____

1. When Travelers filed its joinder to the Comerica
objection, it concurrently filed a statement of opposition.
"Travelers Casualty and Surety Company of America's Joinder to
Comerica Bank's Opposition to First and Final Fee Application of
Meyers Law Group, P.C. for Compensation and Reimbursement of
Expenses," filed October 5, 2011.  Travelers appeared at the
initial hearing and has not withdrawn its separate opposition.

## I.   AMOUNT OF COMPENSATION REQUESTED

MLG seeks an award of attorney's fees in the amount of $324,102.00 and reimbursement of expenses in the amount of $5,426.31, for a total of $329,528.31.  MLG seeks approval of these amounts for services rendered from February 2, 2011 through September 28, 2011.

On an interim basis, the court entered an order on November 8, 2011 allowing compensation in the amount of $162,051.00 and reimbursement of expenses in the amount of $2,713.16, for a total interim award of $164,764.16 (the "Interim Award").  For the reasons set forth below, the court will grant the Application in part.

## II.   BACKGROUND

Curtis A. Westwood (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code[2] on February 2, 2011 (the "Petition Date").  The Debtor operated a real estate development business through various entities in which he controlled and maintained partial ownership interests.  The Debtor's interests in the entities include the following:

- a 51% interest in Westwood Homes, Inc., a California corporation ("WHI");
- a 50% interest in Lucille Westwood LTD ("LWL");
- a nominal interest in Sierra de Montserrat Loan Fund LLC ("Loan Fund"); and

---

2.  Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

1    •    a 4% interest in Westwood Montserrat LTD ("WML").

2    WHI is the general partner of an entity called Westwood
3    Promontory LTD ("WPL"), and prior to February 10, 2010, was the
4    general partner of WML.  Together, these entities will be called
5    the "Westwood Entities."  The purpose of the Westwood Entities
6    was to develop and construct various real estate projects.  WML
7    had the specific purpose of developing a residential project
8    formally known as Sierra de Montserrat, and a related vineyard
9    (collectively, the "Montserrat Project").

10    Comerica provided secured financing for the Montserrat
11    Project in the approximate amount of $23,000,000.  Prior to the
12    Petition Date, WML defaulted on the Comerica loan, triggering
13    Comerica's foreclosure upon its collateral and pursuit of the
14    guarantors.  On the eve of the Debtor's bankruptcy, Comerica
15    obtained a judgment against the Debtor in state court in the
16    amount of $14,753,781.40, based on Comerica's alleged deficiency
17    claim and the Debtor's guarantee on the loan.  Faced with
18    Comerica's enforcement of the judgment, the Debtor commenced this
19    case.  The Debtor disputes Comerica's claim and has appealed the
20    state court judgment.

21    The Debtor and WHI were also entangled in a separate dispute
22    over construction bonds, issued for the Montserrat Project prior
23    to the Petition Date.  Specifically, Travelers provided the
24    construction bonds, obtaining indemnification for the bonds from
25    WHI and the Debtor, and securing the indemnity obligations with
26    the personal property of each.  In 2007, WML became embroiled in
27    a dispute with a subcontractor of the Montserrat Project, ARB,
28    Inc. ("ARB"), and its general contractor, De Silva Gates ("DSG").

- 3 -

1  When ARB asserted a claim of damages of over $4,000,000 in a
2  state court action (the "ARB Action"), Travelers became a party
3  by virtue of the construction bonds.  This event, in turn,
4  implicated WHI and the Debtor's obligation to indemnify
5  Travelers.  Since the ARB Action was pending on the Petition
6  Date, Travelers held a contingent, unliquidated secured claim
7  against the Debtor based on the secured indemnity obligation that
8  the Debtor owed to Travelers.

9                    III.  THE CHAPTER 11 CASE

10       On February 16, 2011, the court entered an order approving
11  MLG's employment.[3]  MLG assisted the Debtor in fulfilling his
12  basic duties as a debtor-in-possession; the Debtor timely filed
13  his schedules of assets and liabilities and statement of
14  financial affairs, and the Debtor attended meetings of creditors
15  and filed monthly operating reports.  As described below, a
16  source of significant controversy in the case was the
17  appropriateness of certain cash outlays made by the Westwood
18  Entities; the Objecting Parties base much of their opposition to
19  the Application on the disbursements made by the Westwood
20  Entities to various third parties following the Petition Date,
21  but before the appointment of the Trustee (the "Affiliate
22  Outlays").[4]

23

24       3.   Prior to the Petition Date, MLG had received from the
    Debtor several retainer payments totaling $500,000.  As of the
25  Petition Date, the remaining balance of the retainer was
    $394,227.46.  The Interim Award authorized MLG to pay to itself
26  $164,764.16 from the balance of the retainer.

27       4.   Comerica was aware of the Debtor's relationship to the
    Westwood Entities and the inter-company indebtedness well before
28  the Petition Date.  Nevertheless, when Comerica was served with
                                                    (continued...)

- 4 -

The Westwood Entities are account debtors of the Debtor because certain receivables were generated when the Debtor made pre-petition loans to the Westwood Entities. The face amount of the receivables from the Westwood Entities exceeds $2,000,000.[5] Because of "limited marketability," the Debtor discounted these receivables by 25% to 50% from face value.[6] After accounting for the discounts, the total value of the receivables stands at $1,110,382.50.[7] Of import, the Debtor and his sister own and control the Westwood Entities.[8]

On May 18, 2011, Comerica filed a motion for an order directing the appointment of a chapter 11 trustee (the "Trustee Motion"). On June 29, 2011, the court granted the Trustee Motion based on a concern that there was an inherent conflict created by the Debtor's ownership and control of the Westwood Entities and the Debtor's duty to collect the aforementioned receivables --

---

4. (...continued)
MLG's employment application, it did not object to MLG's employment.

5.   Exhibit B-16 to the Debtor's Schedule B, filed February 16, 2011 and amended on November 28, 2011. The face value of the Debtor's interest in the receivables breaks down as follows:

a secured note issued by WML - $70,781;
an unsecured note receivable issued by WHI - $1,426,847;
an unsecured note receivable issued by LWL - $493,800;
an unsecured note receivable issued by WPL - $68,000;
an unsecured note receivable issued by WHI for the benefit of a tax credit trust - $27,550; and
an unsecured note receivable issued by WML for the benefit of a family trust - $132,145.

6.   Id.

7.   Id.

8.   As to some of the Westwood Entities, the Debtor's wife is also a part owner.

1  the most significant non-exempt assets of the chapter 11 estate.
2  The court accepted at face value the Debtor's representations
3  that he had been candid in disclosing information regarding the
4  Westwood Entities and the extensions of credit.  Notwithstanding,
5  the court found "cause" under § 1104(a), and entered a minute
6  order granting the Trustee Motion.  Subsequently, on July 11,
7  2011, the court entered an order duly appointing the Trustee.

8      When it granted the Interim Award, the court noted that it
9  lacked sufficient information to assess whether the Affiliate
10  Outlays were improper or inappropriate.  To better understand
11  these transactions, the court requested that the Trustee
12  investigate the propriety of the Affiliate Outlays, and allowed
13  further briefing.

14      After conducting his investigation, the Trustee filed a
15  report on December 5, 2011 that set forth the Trustee's position
16  regarding the Affiliate Outlays.  In essence, the Trustee stated
17  that he would not have authorized some of the post-petition
18  payments made by the Westwood Entities, based on his belief that
19  some of the Affiliate Outlays would impede the estate's recovery
20  of the receivables.  At the same time, the Trustee appreciated
21  the complex interrelationships among the Westwood Entities, some
22  of whom continue to operate a business.[9]  The court finds that

23

24      9.   Report of Chapter 11 Trustee Jon Tesar on Post-Petition
25  Activity of Affiliated Entities, filed December 5, 2011
    ("Trustee's Report") at 3:13-15 ("[WHI and LWL] ... continue to
26  conduct business. ... I understand they service homeowner claims
    and continue searching for ways to liquidate certain real estate
27  assets"); and 7:18-21 ("The 5 Entities are relatively complicated
    intertwined ventures.  I probably do not completely understand
28  the interrelationships and motivations of these entities. ... As
    a result, not all of the spending decisions make sense to me.")

- 6 -

1  the Affiliate Outlays reflect payments made on outstanding

2  obligations that predated this case as well as payments permitted

3  in the ordinary course of operating a real estate development

4  business.[10]   Although the Trustee has indicated that he believes

5  some of the Affiliate Outlays were imprudent, there is nothing in

6  the record to suggest that the Affiliate Outlays were fraudulent

7  or that other wrongful activity occurred in this case.  As

8  explained below, the court will not penalize MLG solely for

9  representing a debtor-in-possession, who, incidentally, owns and

10 controls non-debtor entities that are indebted to the Debtor's

11 estate.

12      As a result of the conflict that existed among the Westwood

13 Entities, the Objecting Parties argue that MLG's compensation

14 should be reduced, across the board, by 35%.  In particular, the

15 Objecting Parties seek these across-the-board reductions in MLG's

16 fees for the following services:  (1) the preparation of the

17 Debtor's Motion for Authority to Obtain Secured Postpetition

18 Financing and Grant Postpetition Liens, filed June 15, 2011,

19 Docket Number 129 (the "Financing Motion Services"); (2) the

20 drafting of the Debtor's plan and disclosure statement (the "Plan

21 Services"); (3) the settlement of the ARB Action involving

22 Travelers (the "Travelers Settlement Services"); (4) the services

23 performed after the Trustee was appointed (the "Post-Trustee

24 Services"); and (5) the services performed in defending the

25 Debtor's claim of exemptions (the "Exemption Defense Services").

26 / / /

27

28      10.  See, e.g., Trustee's Report at 4, ¶ 2; 5, ¶¶ 4-5; 6, ¶
   6.

1   For the reasons stated below, the court will not implement
2   an across-the-board reduction, but will (1) deny the fees
3   requested for the Financing Motion Services; (2) reduce by 30%
4   the fees requested for the Plan Services; (3) reduce by 30% the
5   fees requested for the Travelers Settlement Services; (4) deny
6   fees requested for the Post-Trustee Services to the extent such
7   services do not pertain to preparation of the Application; and
8   (5) approve the fees requested for the Exemption Defense Services
9   to the extent such services were rendered before the Trustee was
10  appointed.

11                          III.  ANALYSIS

12  A.  Standards for Evaluating Fee Applications

13      The Application is brought pursuant to § 330.  Section
14  330(a)(3) sets out the standards by which courts should determine
15  the reasonableness of compensation of professional persons.
16  Reasonableness is determined by considering the nature, extent,
17  and value of the services rendered, taking into account all
18  relevant factors, including the time spent; the rates charged;
19  whether the services were necessary to the administration of, or
20  beneficial at the time they were rendered toward the completion
21  of, the case; whether the services were performed within a
22  reasonable amount of time commensurate with the complexity,
23  importance, and nature of the problem, issue, or task addressed;
24  whether the professional is board certified or otherwise has
25  demonstrated skill and experience in the bankruptcy field; and
26  whether the compensation is reasonable based on the customary
27  compensation of comparably skilled attorneys in other types of
28  cases.  § 330(a)(3); see In re Eliapo, 298 B.R. 392, 401 (9th

Cir. B.A.P. 2003), rev'd in part on other grounds, 468 F.3d 592

(9th Cir. 2006).

The applicant has the burden of proof to demonstrate that it

is entitled to the fees and costs requested under § 330.

Roderick v. Levy (In re Roderick Timber Co.), 185 B.R. 601, 606

(9th Cir. 1995) (citing In re Travel Headquarters, Inc., 140 B.R.

260, 261 (9th Cir. B.A.P. 1992)).  Based on the records

presented, the court determines, in its own discretion, the

reasonable compensation for actual, necessary services rendered

and expenses incurred.  Travel Headquarters, 140 B.R. at 262; §

330(a)(1)(A)-(B).

The court shall not allow compensation for unnecessary

duplication of services or services that were not reasonably

likely to benefit the estate or necessary to the administration

of the case.  § 330(a)(4).  All fees previously allowed on an

interim basis remain subject to review at a later stage in the

case.  See § 330(a)(5).[11]

**B.  Nature, Extent, and Value of the Services**

From the outset, considering the interrelationships among

the Westwood Entities and the pending state court litigation,

MLG's representation of the Debtor was not always a

straightforward task; the court appreciates the difficulty

encountered by MLG in shepherding the Debtor through the process

/ / /

---

11.  The Objecting Parties do not object to the quality of
the services rendered or the time spent and the rates charged.
Rather, the Objecting Parties focus their opposition on whether
the particular services were necessary or beneficial to the
bankruptcy case.

1  of meeting his fiduciary duties to the estate, while the Debtor
2  maintained management positions with the Westwood Entities.

3      MLG competently handled the administration of this case and
4  helped the Debtor navigate through the chapter 11 process until
5  the Trustee was appointed.  Notwithstanding the Objecting
6  Parties' general grievance that MLG's services were tainted by a
7  conflict of interest, the court declines to deny fees to MLG in a
8  blanket fashion.  With that said, however, not all of MLG's
9  services were necessary to the administration of the case, or
10 beneficial at the time they were rendered.  The court will now
11 address the Objecting Parties' objections in detail.

12 **C.  The Objections**

13      The court will first address the Objecting Parties' general
14 contention that MLG's services were fatally infected with
15 conflicts, such that a 35% across-the-board reduction in fees is
16 warranted.[12]  The court is mindful that it granted the Trustee
17 Motion and appointed the Trustee based, in part, on the inherent
18 conflict created by the Debtor's ownership and control of the
19 Westwood Entities and the Debtor's duty to collect accounts
20 receivable from those entities.  In the context of evaluating the
21 Application, however, this conflict and that the Trustee was
22 appointed does not per se warrant an across-the-board reduction.
23 Absent an indication that MLG turned a blind eye to conduct
24 clearly detrimental to the estate, or was representing the
25 interests of the Westwood Entities while simultaneously

26

27  12.  Comerica Bank's Opposition to First and Final
Application of Meyers Law Group, P.C. for Compensation and
28 Reimbursement of Expenses, filed October 5, 2011 ("Opposition")
at 5:7-6:23.

- 10 -

1  representing the Debtor as debtor-in-possession, an across-the-
2  board reduction is not warranted.

3      The abstract concept of a debtor-in-possession -- as
4  distinguished from a debtor -- presents an inherent tension in
5  every reorganization case.  The reasoning of the court in In re
6  Bonner Mall P'ship, 2 F.3d 899 (9th Cir. 1993) is instructive.[13]
7  In addressing the argument that allowing a debtor-in-possession
8  to run the business in lieu of a trustee encourages self-dealing,
9  the court responded as follows:

10      "[T]he very purpose of the Code's creation of the debtor-in-
        possession was to increase the power of those in control of
11      the debtor during the reorganization process.  Bankruptcy
        law is very formalistic in that it treats the debtor, the
12      debtor-in-possession, and old equity as legally distinct
        entities when in reality they may all be one and the same.
13      *The risk of self-dealing among these entities at the expense
        of creditors is a risk created by the Code itself.*"

14      Bonner Mall, 2 F.3d at 915 (emphasis added).

15

16  Granted, the court appointed the Trustee because of the problems
17  created by the Debtor's ownership of and authority over the
18  Westwood Entities.  In so doing, the court recognized that the
19  creditors in this case had a crisis of confidence in the Debtor's
20  ability to faithfully maximize the value of the estate.  As a
21  result, the court concluded that it was in the interests of
22  creditors to appoint the Trustee to ensure maximum recovery on
23  the accounts receivable owing from the Westwood Entities.

24      Having said that, the court notes that the dual rights and
25  duties of a debtor-in-possession and individual debtor often

26

27      13.  Although the Bonner Mall case decided the viability of
    the "new value" exception in the chapter 11 "cramdown" context,
28  its comments are helpful in addressing the Objecting Parties'
    conflict argument.

1 | create a situation that is conflict-ridden.  As the court in
2 | <u>Bonner Mall</u> aptly stated, the conflict is created by the Code
3 | itself, and it is with that understanding that the court
4 | evaluates the Application.  Therefore, the court finds that a 35%
5 | blanket reduction in MLG's fees is not warranted.

6 | Next, the court will address the Objecting Parties'
7 | grievances as to certain categories of services rendered by MLG.
8 | The court will deny MLG's fees in whole with respect to the
9 | Financing Motion Services.  That motion sought court approval to
10 | borrow up to $50,000 from WHI on a secured basis in order to
11 | compensate certain valuation experts.  The court finds that such
12 | a proposal was manifestly unreasonable at the time the Financing
13 | Motion Services were rendered.  The court agrees with the
14 | Objecting Parties' argument that "[t]he Debtor's attempt to
15 | borrow money from WHI on a secured basis rather than simply
16 | authoriz[e] WHI to repay a small fraction of its obligations to
17 | the estate in no way served creditors' interests."[14]  Considering
18 | WHI's substantial obligation to the Debtor's estate and the
19 | overall relation between the Debtor and WHI, the court finds that
20 | MLG's decision to go forward with the Financing Motion Services
21 | was unreasonable.[15]  Accordingly, the court will deny MLG's
22 | requested compensation in the amount of $10,694 for the Financing
23 | Motion Services.

24 | / / /

25 |

---

26 | 14.   Opposition at 7:12-14.

27 | 15.   Although the pursuit of financing to pay the
contemplated experts may have been necessary at the time, the
28 | specific proposal under the Financing Motion Services was simply
inappropriate.

1  The court will approve in part MLG's fees with respect to
2  the Plan Services.  The Objecting Parties argue that following
3  the filing of the Trustee Motion, MLG should have abandoned work
4  on the Plan Services because it became apparent that the
5  landscape of the case would change if and when a chapter 11
6  trustee was appointed.[16]  The Objecting Parties question whether
7  MLG should be paid from the estate for preparing a "never-filed"
8  plan and disclosure statement when MLG was representing a debtor-
9  in-possession with "dual roles ... which constituted a manifest
10  and disqualifying conflict."[17]

11  The ultimate goal of a chapter 11 debtor is to confirm a
12  plan.  While that is true, the court recognizes that MLG may also
13  have had certain strategic objectives in mind when continuing
14  work on the Plan Services.  Namely, MLG may have wanted to
15  counter the Trustee Motion and rebut arguments against the
16  Debtor's good faith by having a plan on file.  Therefore, the
17  court will not penalize MLG for continuing the Plan Services
18  notwithstanding the filing of the Trustee Motion.  Nevertheless,
19  the court shares the Objecting Parties' concern that the Debtor
20  never filed a plan and disclosure statement.  Thus, the court
21  does not have the benefit of evaluating the documents to
22  ascertain the necessity and reasonableness of the Plan Services.
23  "The lodestar approach is the primary, not exclusive method
24  for calculating fees, and [] the court could employ an
25  alternative formula where the court could not realistically
26

27      16.  Opposition at 7:23-8:2.

28      17.  Id. at 9:1-6.

- 13 -

1 quantify to numerical precision the lodestar calculation."  In re
2 Auto Parts Club, Inc., 211 B.R. 29, 35 (9th Cir. B.A.P.
3 1997)(citing Unsecured Creditors' Comm. v. Puget Sound Plywood,
4 Inc., 924 F.2d 955, 960 (9th Cir. 1991)).  "If a fee application
5 is inadequate, the court should not be forced to wade through it
6 in order to calculate a lodestar."  Id.  When it was presented
7 with difficulties of calculation, the court in Puget Sound
8 abandoned the lodestar approach, and instead, awarded counsel
9 only one third of requested fees.

10     Here, the court is presented with the difficulty of
11 determining the reasonable value, and the benefit to the estate,
12 of the Plan Services, when the plan and disclosure statement were
13 never even presented to the court.  This makes it very difficult
14 for the court to assess the necessity and reasonableness of the
15 Plan Services.  Therefore, the court will step outside of the
16 lodestar approach in evaluating the Plan Services.  Because the
17 court finds that there may well have been a valid and reasonable
18 motivation behind the Plan Services, yet lacks the benefit of
19 reviewing the documents, the court will reduce by 30% MLG's
20 requested compensation in the amount of $70,512 for the Plan
21 Services, and thus, the reduced amount that the court will
22 approve is $49,358.40.

23     The court will approve in part MLG's fees with respect to
24 the Travelers Settlement Services.  MLG was engaged in extensive
25 settlement efforts arising from the ARB Action:  the dispute
26 involved "close to ten parties in interest."[18]  The Objecting
27 Parties agree that the Travelers Settlement Services "had the
28

18.  The Application at 9:23.

- 14 -

1   indirect benefit of significantly reducing the contingent,
2   purportedly secured, claim of Travelers against the Debtor's
3   estate based on an [i]ndemnity [a]greement," which would
4   ultimately reduce Travelers's claim.

5        The problem lies in the Debtor's choice to condition the
6   settlement on confirmation of a plan of reorganization proposed
7   by the Debtor.  As a result of this decision, the settlement was
8   never approved, nor even made its way before the court.  The
9   court observes, and as the Objecting Parties have noted, the
10  settlement could likely have been approved by a Rule 9019
11  compromise motion even if it involved the transfer of assets.
12  The court appreciates that, for purposes of plan confirmation,
13  the Debtor may have been attempting to obtain an impaired
14  accepting class as required by § 1129(a)(10), and understands
15  that the Debtor may have had strategic reasons for structuring
16  the settlement in the way he did.

17       As to the Travelers Settlement Services, the court is again
18  presented with the difficulty of determining the benefit to the
19  estate of the Travelers Settlement Services, when the settlement
20  was never even presented to the court through a compromise motion
21  or a plan.  This makes it very difficult for the court to assess
22  the necessity and reasonableness of the Travelers Settlement
23  Services.  Therefore, the court will step outside of the lodestar
24  approach in evaluating the Travelers Settlement Services.
25  Accordingly, the court will reduce by 30% MLG's requested
26  compensation in the amount of $59,923 for the Travelers
27  Settlement Services, and thus, the reduced amount that the court
28  will approve is $41,946.10.

1    The Objecting Parties also take issue with the Post-Trustee
2 Services.  They argue that compensation for MLG's services
3 rendered on or after July 12, 2011 should not be approved.  The
4 court agrees, but only to the extent that the Post-Trustee
5 Services were not in regard to preparing the Application.

6    The Supreme Court has clearly stated that "§ 330(a)(1) does
7 not authorize compensation awards to debtors' attorneys from
8 estate funds, unless they are employed as authorized by § 327,"
9 and "[i]f the attorney is to be paid from estate funds under §
10 330(a)(1) in a Chapter 7 case, he must be employed by the trustee
11 and approved by the court." Lamie v. U.S. Trustee, 540 U.S. 526,
12 538-39 (2004).  Lamie's "underlying rationale turned on cessation
13 of status as debtor in possession[, which] indicates that there
14 is no reason to doubt that [Lamie] applies equally to chapter 11
15 cases in which a trustee is appointed." In re Johnson, 397 B.R.
16 486, 490 (Bankr. E.D. Cal. 2008).

17    When the Trustee was appointed in this case, the Debtor
18 ceased to be a debtor-in-possession.  As such, MLG's
19 representation authorized under § 327 terminated as of the
20 Trustee's appointment.  The following services were rendered by
21 MLG on or after July 12, 2011: preparation of the Application,
22 certain aspects of case administration, and a portion of the
23 Exemption Defense Services.[19]  The court will consider and discuss
24 these categories separately below.

25
26    19.   MLG seeks a total of $20,821.00 for the Post-Trustee
Services.  MLG seeks a total of $19,007 for the time spent
27 preparing the Application, all of which was generated in the
post-Trustee period.  MLG seeks a total of $9,072 for the case
28 administration category, $806 of which was generated in the post-
Trustee period.  MLG seeks a total of $19,860 for the Exemption
Defense Services, $1,008 of which was generated in the post-
Trustee period.

- 16 -

1       The court will approve all of MLG's requested compensation
2   in the amount of $19,007 for time spent preparing the
3   Application.  "[B]ankruptcy counsel are entitled to compensation
4   for time and effort spent in preparing fee applications."  In re
5   Nucorp Energy, Inc. 764 F.2d 655, 662 (9th Cir. 1985).  To
6   require attorneys to file fee applications, yet "refuse to award
7   compensation [to them] for the time spent preparing or litigating
8   fee applications," would result in the dilution of the attorney's
9   rate for services.  Id.  The compensation of professionals in the
10  bankruptcy arena is a peculiar practice.  To be paid, Rule 2016
11  requires the professional to prepare and present an extensive fee
12  application.  Lest the dilution of deserved fees, the court will
13  not deny compensation for time and effort MLG spent in preparing
14  the Application.

15      As stated above, the Supreme Court in Lamie emphasized that
16  an attorney can only be paid if he or she is employed by the
17  trustee and approved by the court.  From February 2, 2011 through
18  July 11, 2011, MLG was authorized under § 327 as the
19  representative of the debtor-in-possession.  However, MLG's time
20  spent in preparing the Application should not be discounted
21  merely because most of it was prepared in the post-Trustee
22  period, as the Bankruptcy Code and Rules require the preparation
23  of the Application.  Lamie's requirement that the representative
24  be authorized under § 327 does not compel this court to deny
25  substantially all of MLG's fees for the preparation of the
26  Application.  On the other hand, MLG's services pertaining to
27  case administration and the Exemption Defense Services in the
28  post-Trustee period will be denied, because these were either

- 17 -

1  services rendered on behalf of the estate's representative -- the
2  Trustee -- when the Trustee had not retained MLG pursuant to §
3  327, or services rendered on behalf of the Debtor.  Thus, the
4  court will deny $806 of MLG's services performed in the case
5  administration category and $1,008 for the Exemption Defense
6  Services.

7      The Objecting Parties' last specific objection concerns the
8  Exemption Defense Services.  As stated above, $1,008 of the
9  $19,860 requested by MLG for these services will be denied since
10 that portion of the fees was generated in the post-Trustee
11 period.  The court will approve, however, the rest of those fees
12 because the Exemption Defense Services were not only reasonable
13 but fundamental to the representation of an individual in chapter
14 11 proceedings, and rendered at a time when the Debtor was a
15 debtor-in-possession.  As stated earlier, when the debtor is an
16 individual there often is an inherent tension that arises from
17 the Bankruptcy Code's creation of the debtor-in-possession
18 entity.  A debtor-in-possession owes a fiduciary duty to
19 creditors to maximize the value of the estate.  Paradoxically, a
20 debtor who is an individual enjoys the benefits of exemptions
21 provided by the Bankruptcy Code that are -- by definition --
22 designed to reduce recovery for creditors.  Based on this
23 reasoning, the court finds that although the Exemption Defense
24 Services benefitted the Debtor, they also assisted the overall
25 administration of the case.

26                          **IV.   CONCLUSION**

27     Based on the foregoing, the court will limit MLG's fees to
28 $272,463.50.  The court will also award MLG its costs, in the

1  amount requested of $5,426.31.  Thus, the total award will be in

2  the amount of $277,889.81.  Reducing the Interim Award amount of

3  $164,764.16 from the total award amount, the total adjusted

4  amount of the award is $113,125.65.

5       The court will issue an appropriate order.

6

7  Dated: February 6, 2012

8                                        ROBERT S. BARDWIL
                                         United States Bankruptcy Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 19 -